IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BNSF RAILWAY COMPANY, | ) | 4:05CV3084 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| vs. | ) | **AND ORDER** |
| | ) | |
| EPCO CARBONDIOXIDE PRODUCTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, BNSF Railway Company, alleges that the defendant, EPCO Carbondioxide Products, Inc., owes it an unspecified amount for demurrage,[1] storage,[2] switching, and miscellaneous charges, plus a 12% finance charge on the

---

[1] Railroads charge shippers and receivers of freight "demurrage" fees if the shippers or receivers detain freight cars on the rails beyond a designated number of days. Union Pacific R. Co. v. Ametek, Inc., 104 F.3d 558, 559 n. 2 (3rd Cir. 1997). "(D)emurrage charges are in part compensation and in part penalty; . . . in full character they are neither, not being rates as that term is used in connection with rate-making, nor penalties as that term is used in respect to penal impositions. They are sui generis. Historically, textually, in purposes and in content, they are an integral part of the established rules and regulations relating to the use and movement of cars. From the beginning they have been sustained as rules and regulations. They could not have been sustained as carrier charges or as penalties." I.C.C. v. Oregon Pac. Industries, Inc., 420 U.S. 184, 190 (1975) (quoting Inversen v. United States, 63 F. Supp. 1001, 1005-6 (D.D.C.), aff'd per curiam, 327 U.S. 767 (1946)).

[2] Storage charges are similar to demurrage, and are tariffed and imposed for use, beyond a prescribed free time, of a carrier's track or storage facilities. See Dana Corp. v. I.C.C., 703 F.2d 1297, 1303 (D.C. Cir. 1983).

unpaid amount. Four theories of recovery or "claims" are alleged: (1) the filed rate doctrine;[3] (2) breach of contract; (3) account stated; and (4) quantum meruit. EPCO, having previously answered the complaint, has moved pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings as to the final three theories of recovery. That is, EPCO contends that BNSF can only recover in strict accordance with its tariffs for the services provided.

In support of its motion, EPCO relies upon CSX Transportation, Inc. v. City of Pensacola, 887 F. Supp. 275 (N. D. Fla. 1995), in which a rail carrier sought to recover demurrage charges based on (1) the rate stated in its filed tariff, (2) quantum meruit, and (3) quasi-contract. The court dismissed both equitable theories as being precluded by the filed rate doctrine, stating: "Just as a shipper may not assert equitable defenses to the collection of the tariff, a rail carrier should not be able to assert equitable legal claims to avoid strict compliance with a tariff it has formulated." Id. at 279. Such holding is generally in accord with well-established caselaw in this circuit, at least insofar as collection actions that predate the Staggers Rail Act of 1980 are concerned. See, e.g., Missouri Pacific Railroad Co. v. Rutledge Oil Co., 669 F.2d 557, 558-59 (8th Cir. 1982) (railroad could not be equitably estopped from collecting demurrage charges as established by tariff); Chicago, Burlington & Quincy Railroad Co. v. Ready Mixed Concrete Co., 487 F.2d 1263, 1267 (8th Cir. 1973) (switching charges established by tariff could not be changed or waived); Furniture Forwarders of St. Louis, Inc. v. Chicago, R. I. & P. R. Co., 393 F.2d 537, 538 (8th Cir. 1968) (demurrage must be based upon established tariffs).

The CSX decision did not hold that the filed rate doctrine prevented the rail carrier from suing for breach of contract. Indeed, in a later decision rendered in the same case, it was held that the rail carrier was entitled to file an amended complaint

---

[3] The filed rate doctrine actually is a common law rule that forbids a regulated entity, usually a common carrier, to charge a rate other than the one on file with the appropriate federal regulatory authority. See Qwest Corp. v. Scott, 380 F.3d 367, 374-75 (8th Cir. 2004).

2

alleging breach of contract. See CSX Transportation, Inc. v. City of Pensacola, 936 F. Supp. 885, 887-89 (N. D. Fla. 1995). The court recognized that Congress, in passing the Staggers Rail Act, had "specifically granted railroads the authority to enter into contracts to provide rail transportation services." Id., at 888 (citing Section 208 of the Staggers Rail Act, Pub. L. 96-448, 94 Stat. 1895 (1980), codified at former 49 U.S.C. § 10713 (recodified effective January 1, 1996, at 49 U.S.C. § 10709)).[4]

The city argued that the alleged contract was invalid because it had not been filed with the Interstate Commerce Commission, as was then required by § 208(b)(1) of the Staggers Rail Act for contracts entered into under authority of § 208(a). The court rejected this argument, stating that it was "questionable whether the phrase 'rail service[s]' [as used in § 208(a)] can be read so expansively as to cover demurrage[,]" and that "it seems that the validity of contracts for the payment of demurrage has long been recognized." Id. (citations omitted). In the three cases the court cited for this proposition, however, the "contracts for the payment of demurrage" did not fix the amount of such payments. As noted previously, the Eighth Circuit has consistently held that the filed rate doctrine applies to demurrage charges. See also Sinclair Refining Co. v. Schaff, 275 F. 769 (8th Cir. 1921) (under the Interstate Commerce Act, the charge of demurrage by a railroad company for detention of cars by a shipper or consignee is not a matter of contract between the parties, but the rates fixed by the tariff schedules filed must be charged and enforced). Since the ICC contract-filing

---

[4] "(a) One or more rail carriers providing transportation subject to the jurisdiction of the Board may enter into a contract with one or more purchasers of rail services to provide specified services under specified rates and conditions.

"(b) A party to a contract entered into under this section shall have no duty in connection with services provided under such contract other than those duties specified by the terms of the contract."

49 U.S.C.A. § 10709(a)&(b) (West 1997). The original language of § 208 referenced the Interstate Commerce Commission. The Commission was replaced by the Surface Transportation Board on January 1, 1996. See Interstate Commerce Commission Termination Act, Pub. L. 104-88, 109 Stat. 803 (1995), codified generally at Title 49.

requirement was eliminated as part of the Interstate Commerce Commission Termination Act, effective January 1, 1996,[5] this secondary holding has no direct application here. Even so, the decision's primary holding—that a rail carrier can recover demurrage charges on a breach-of-contract theory—argues against granting EPCO's motion for judgment on the pleadings with respect to the complaint's "Second Claim for Relief (Breach of Contract)."[6]

BNSF has also provided the court with a copy of an opinion filed by the Surface Transportation Board, H. B. Fuller Co. v. Southern Pacific Transportation Co., No. 41510, 1997 WL 476350, 2 S.T.B. 550 (1997), which held that the Board lacked jurisdiction over a shipper's complaint challenging the reasonableness of a rail carrier's demurrage and storage charges where the parties had entered into a transportation contract that incorporated by reference the applicable tariff terms for demurrage and storage. The statutory basis for the Board's ruling was former 49 U.S.C. § 10713(i) (recodified at 49 U.S.C. § 10709(c)).[7]

---

[5] Current law only requires the filing of summaries of contracts for the transportation of agricultural products. See 49 U.S.C. § 10709(d)(1) and 49 C.F.R. §§ 1313.1 to 1313.10.

[6] EPCO states in its brief that "CSX's Count III [quasi-contract claim] is the same as BNSF's Second Claim for Relief, 'Breach of Contract.'" (Filing 8, p. 2.) However, BNSF asserts that it alleging there was an actual contract between the parties that governs the rates charged for at least some of the services. Thus, BNSF states in its brief that it "verily believes and has alleged that some or all of the services it provided to Epco were covered under a contract as contemplated by Section 10709 [ 49 U.S.C. §10709]. Additionally, in the alternative, BNSF has alleged the elements for recovery under the equitable doctrine of quantum meruit." (Filing 12, p. 5.) As will be discussed subsequently, the court disagrees with BNSF's assessment that it has adequately alleged the existence of a § 10709 contract.

[7] "A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, and may not be subsequently challenged before the Board or in any court on the grounds that such contract violates a provision of this part." 49 U.S.C.A. § 10709(c)(1) (West 1997).

4

While this agency decision obviously supports BNSF's position that the filed rate doctrine no longer precludes it from contracting for demurrage, storage, and other charges, it is not clear from BNSF's complaint that any such contract was entered into with EPCO. BNSF only alleges that the court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question)[8] and 1337 (federal act regulating commerce),[9] because the action arises under 49 U.S.C. §§ 10101 (rail transportation policy),[10] 10702 (rail carrier rates),[11] 10722 (car utilization),[12] 10743 (liability for payment of

---

[8] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C.A. § 1331 (West 1993).

[9] "The district courts shall have original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies . . .." 28 U.S.C.A. § 1337(a) (West Supp. 2004).

[10] The current policy, among other things, is "to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail." 49 U.S.C.A. § 10101(a) (West 1997).

[11] "A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall establish reasonable—
" (1) rates, to the extent required by section 10707, divisions of joint rates, and classifications for transportation and service it may provide under this part; and
"(2) rules and practices on matters related to that transportation or service." 49 U.S.C.A. § 10702 (West 1997).
Section 10707 only requires reasonable rates where the rail carrier has "market dominance," that is, "an absence of effective competition from other rail carriers or modes of transportation for the transportation to which a rate applies." 49 U.S.C.A. § 10707(a) (West 1997). Otherwise, the rail carrier "may establish <u>any</u> rate for transportation or other service provided by the rail carrier." 49 U.S.C.A. § 10701(c) (West 1997) (emphasis supplied).

[12] "In order to encourage more efficient use of freight cars, notwithstanding any other provision of this part, rail carriers shall be permitted to establish premium charges for special services or special levels of services not otherwise applicable to the movement. The Board shall facilitate development of such charges so as to

5

rates),[13] and 10746 (demurrage charges).[14] There is no allegation that the action arises under 49 U.S.C. § 10709 (contracts),[15] nor is there any allegation that the court has subject matter jurisdiction under 28 U.S.C. § 1332 (diversity of citizenship) or 28 U.S.C. § 1367 (supplemental jurisdiction).

BNSF's complaint does not identify any particular contract that was entered into by the parties, nor does it identify any applicable tariff. For its statement of "common facts," BNSF only alleges in vague terms that:

> Pursuant to the contracts for carriage, applicable demurrage books, car storage rule books, tariffs, or rules and regulations in effect between BNSF and EPCO at all relevant time periods, EPCO requested railcars of various types (hereinafter collectively referred to as "railcars") to be moved within the State of Nebraska, Missouri, Minnesota and Iowa and/or other states. For the benefit of EPCO, BNSF moved such railcars and EPCO stored said railcars on BNSF rails, and/or EPCO failed to

---

increase the utilization of equipment." 49 U.S.C.A. § 10722 (West 1997).

[13] Section 10743 concerns the liability of a consignee for rail transportation charges under various circumstances, and provides that "[a] rail carrier may bring an action to enforce liability under . . . this section." 49 U.S.C.A. § 10743(c)(1)&(2) (West 1997).

[14] "A rail carrier providing transportation subject to the jurisdiction of the Board under this part shall compute demurrage charges, and establish rules related to those charges, in a way that fulfills the national needs related to—
 "(1) freight car use and distribution; and
 "(2) maintenance of an adequate supply of freight cars to be available for transportation of property."
49 U.S.C.A. § 10746 (West 1997).

[15] "The exclusive remedy for any alleged breach of a contract entered into under this section shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree. This section does not confer original jurisdiction on the district courts of the United States based on section 1331 or 1337 of title 28, United States Code." 49 U.S.C.A. § 10709(c)(2) (West 1997).

6

>return railcars to BNSF within the permitted "free time" under the applicable contracts, and/or BNSF provided switching movements to EPCO obligating EPCO to pay for various charges including but not limited to storage charges, demurrage charges, switching charges, finance charges and charges under the terms of the applicable contracts for carriage, demurrage books, storage rule books, tariffs, applicable rules and regulations and pursuant to 49 U.S.C. §§ 10101, 10702, 10722, 10743 and 10746.

(Filing 1, ¶ 3.) For its breach-of-contract claim, BNSF alleges with even less clarity that "[t]o the extent BNSF and EPCO were parties to various contracts, tariffs and bills of lading governing the storage charges, demurrage charges, switching charges, finance charges and miscellaneous charges, BNSF duly performed all of its obligations under said agreements and rule books[,]" that "BNSF billed EPCO for the cost of such storage and/or demurrage and/or switches and/or finance charges for which BNSF seeks recovery herein[,]" and that "EPCO has breached its agreements with BNSF by failing to pay for those unpaid charges and interest/finance charges for which demand has been made." (Filing 1, ¶¶ 9, 10 (emphasis supplied).)

If BNSF and EPCO entered into one or more contracts that provide the rates to be charged for demurrage, storage, switching and miscellaneous services, then EPCO has no duty to pay in accordance with BNSF's tariffs regarding such services, see 49 U.S.C. § 10709(b), and BNSF's "exclusive remedy" for nonpayment of the contracted services is an action that is brought under state law, see 49 U.S.C. § 10709(c)(2). If the Surface Transportation Board's decision in H. B. Fuller Co. is followed, BNSF may also be limited to bringing a state-law action to the extent that the parties' agreement specifically incorporated BNSF's tariff rates.

If, however, the parties did not enter into a § 10709 contract, then BSNF was obligated as a common carrier to provide the services at the rates and in accordance with the rules and practices it established under 49 U.S.C. §§ 10702, 10722, and 10746 (assuming that the services are subject to the jurisdiction of the Surface

7

Transportation Board). See 49 U.S.C. § 11101.[16] In this regard, it should also be noted that rail carriers are no longer required to file tariffs. They need only disclose rates, charges and service terms upon formal request (and, with respect to the transportation of agricultural products and fertilizer, to publish the rates, charges, and service terms). See id.; 49 C.F.R. §§ 1300.1 to 1300.5. The tariffs also are not subject to prior approval by the Surface Transportation Board; for those tariffs that are subject to a reasonableness requirement, the Board will conduct a rate proceeding only upon the filing of a complaint. See 49 U.S.C. § 10704.

For its "First Claim for Relief (Filed Rate Doctrine)," BSNF alleges that "EPCO agreed to pay BNSF for demurrage and switching charges at the tariff rate." (Filing 1, ¶ 7.) If this allegation had been made with respect to BNSF's "Second Claim for Relief (Breach of Contract)," one might infer that the parties entered into a § 10709 contract for demurrage and switching services. As pleaded, though, one must assume that BNSF's "filed rate doctrine" claim seeks to impose liability based on the federal statutes that are identified in the complaint, and that EPCO's alleged agreement to pay demurrage and switching charges was not a contract for receipt of "specified services under specified rates and conditions," 49 U.S.C. § 10709(a), because with the existence of such a contract, none of the identified statutes would apply. See 49 U.S.C. § 10709(c) (1) ("A contract that is authorized by this section, and transportation under such contract, shall not be subject to this part, . . ..").

---

[16] "(a) A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall provide the transportation or service on reasonable request. . . .

"(b) A rail carrier shall also provide to any person, on request, the carrier's rates and other service terms. . . .

. . .

"(e) A rail carrier shall provide transportation or service in accordance with the rates and service terms, . . ..
49 U.S.C.A. § 11101 (West 1997).

8

Thus, BNSF does not affirmatively allege the existence of a § 10709 contract. It merely seeks to recover on a breach-of-contract theory "to the extent" that such a contract might be found to exist. (Filing 1, ¶ 10.)

Judgment on the pleadings is appropriate where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law. Syverson v. FirePond, Inc., 383 F.3d 745, 749 (8th Cir. 2004). The court must accept as true all facts pleaded by the non-moving party and grant all reasonable inferences from the pleadings in favor of the non-moving party. Id. Because it cannot be inferred from the allegations of BNSF's complaint that the parties entered into an enforceable § 10709 contract, EPCO's motion for judgment on the pleadings will be granted with respect to the "Second Claim for Relief (Breach of Contract)."

Furthermore, it not apparent that the court has jurisdiction over a state-law claim for breach of contract. There is no allegation in the complaint establishing diversity of citizenship or satisfaction of the jurisdictional amount under 28 U.S.C. § 1332, nor can it be concluded from BNSF's vague allegations that the breach-of-contract claim forms part of the same case or controversy as the "filed rate doctrine" claim, so as to permit the court to exercise supplemental jurisdiction under 28 U.S.C. § 1367 (assuming that original jurisdiction exists under 28 U.S.C. §§ 1331 or 1337 with respect to the federal "filed rate doctrine" claim). The jurisdictional basis for BNSF's third and fourth claims also has not been alleged.[17]

---

[17] A pleading setting forth a claim for relief must include "a short and plain statement of the grounds upon which the court's jurisdiction depends." Fed. R. Civ. P. 8(a)(1). Rule 8(a)(1) is satisfied if the complaint "say[s] enough about jurisdiction to create some reasonable likelihood that the court is not about to hear a case that it is not supposed to have the power to hear." Gardner v. First American Title Ins. Co., 294 F.3d 991, 994 (8th Cir. 2002) (quoting Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774, 778 (7th Cir. 1994)). Even though EPCO has not raised a jurisdictional challenge to the complaint, the court is bound to make its own inquiry. See In re Wireless Telephone Federal Cost Recovery Fees Litigation, 396 F.3d 922, 928 (8th

In any event, BNSF's "Third Claim for Relief (Account Stated)" fails to state a claim upon which relief can be granted. An account stated is an agreement between persons who have had previous dealings determining the amount due by reason of such transactions. Sherrets, Smith & Gardner, P.C. v. MJ Optical, Inc., 610 N.W.2d 413, 418 (Neb. 2000).[18] It is a new and independent cause of action founded on the agreed balance due upon the account rendered. Sodoro, Daly & Sodoro, P.C. v. Kramer, 679 N.W.2d 213, 219 (Neb. 2004). In such an action, the plaintiff must allege that the account was, in fact, stated and agreed to. Id.

BNSF merely alleges that it "has made several attempts, including a written demand, on EPCO for full payment of the storage, demurrage, switching and finance charges owed[,]" and that "EPCO has made no payments and remains indebted to BNSF in an amount to be determined at trial." (Filing 1, ¶¶ 12, 13.) Unsatisfied demands for payment do not constitute an account stated.

While there is no question that BNSF's "Fourth Claim for Relief (Quantum Meruit)" could properly be brought in conjunction with a breach-of-contract claim, see, e.g., Tobin v. Flynn & Larsen Implement Co., 369 N.W.2d 96, 98 (Neb. 1985) (one may at the same time proceed on both the theories of contract and quantum meruit, for in either instance the action is premised on the existence of a contract, either express or implied by law), a quantum meruit theory of recovery is inconsistent with the filed rate doctrine. "Generally, the principle of quantum meruit is a contract implied in law theory of recovery based on the equitable doctrine that one will not be

---

Cir. 2005) ("Lack of subject matter jurisdiction cannot be waived by the parties or ignored by the court."). See also Fed. R. Civ. P. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.").

[18] The court does not necessarily assume that Nebraska law governs the state-law claims this case, but for convenience will cite Nebraska cases as examples of generally recognized principles.

allowed to profit or enrich oneself unjustly at the expense of another." Collection Bureau of Grand Island, Inc. v. Fry, 610 N.W.2d 442, 447 (Neb.App. 2000) (quoting Tracy v. Tracy, 581 N.W.2d 96, 101 (Neb.App. 1998) (emphasis omitted). "Where benefits have been received and retained under such circumstances that it would be inequitable and unconscionable to permit the party receiving them to avoid payment therefor, the law requires the party receiving and retaining the benefits to pay their reasonable value." Id. at 448.

If BNSF is correct in claiming that in the absence of an enforceable § 10709 contract EPCO is obligated to pay the "reasonable value" of storage, demurrage and switching services (see Filing 1, ¶ 16), then BNSF's tariff rates must be non-binding. Stated somewhat differently, if quantum meruit is a viable alternative to a state-law breach-of-contract claim in this case, then BNSF must not have a valid claim arising under federal law for recovery of its tariff rates.

A claim arises under federal law when a right created by federal law is an essential element of the plaintiff's action. MCI Telecommunications Corp. v. Garden State Inv. Corp., 981 F.2d 385, 387 (8th Cir. 1992) (finding that carrier's claim for payment was necessarily based on filed federal tariff). Prior to the adoption of the Staggers Rail Act, it was thus held that a railroad could bring a collection action in federal court. See Atchison T. & S. F. Ry. Co. v. Belt, 549 F.2d 1196, 1198 (8th Cir. 1977) (railroad's claim was not an action for the contractual remedy of money had and received, but rather was one which necessarily involved tariffs; district court had jurisdiction of the action under 28 U.S.C. § 1337); Penn Cent. Co. v. General Mills, Inc., 439 F.2d 1338, 1339 (8th Cir. 1971) (action to recover freight charges under and pursuant to the Interstate Commerce Act was a civil action arising under an act of Congress regulating commerce; federal court jurisdiction was proper under 28 U.S.C. § 1337). If BNSF's tariffs no longer have the force of law, see MCI, 981 F.2d at 387 ("federal [telecommunications] tariffs are the law, not mere contracts"), then federal question jurisdiction presumably is lacking in this case. See, e.g., Baker v. Riss &

11

Co., 444 F.2d 257, 259-60 (8th Cir. 1971) (district court lacked subject matter jurisdiction where plaintiff's cause of action rested solely on a divisional agreement, and not upon any tariff or regulation of the ICC).

In summary, BNSF has failed to allege the existence of an express contract that meets the requirements of 49 U.S.C. § 10709, and has also failed to allege necessary jurisdictional facts for its breach-of-contract claim or its alternative claim for relief on an implied contract theory of quantum meruit. Similarly, BNSF has failed to allege the essential elements of an account stated or the jurisdictional grounds for such a contract claim. EPCO's motion for judgment on the pleading therefore will be granted and these three claims will be dismissed. Considering, however, that the claims are being dismissed for reasons that were not argued by EPCO, the court will grant BNSF leave to file an amended complaint to correct each of these pleading defects, if possible.

The court has not finally decided whether, as contended by EPCO, the filed rate doctrine bars BNSF's quantum meruit claim, but it is inclined to accept BNSF's contention that deregulation of the railroad industry has made such relief possible. If BNSF is correct, however, then the court is also of the view that federal question jurisdiction does not exist with respect to BNSF's "filed rate doctrine" claim. The court therefore will require BNSF to show cause why that claim should not also be dismissed for lack of jurisdiction.[19]

Accordingly,

---

[19] No such showing will be required, of course, if BNSF files an amended complaint that does not include a "filed rate doctrine" claim. But the filing of an amended complaint that includes a "filed rate doctrine" claim will not negate this show cause order.

IT IS ORDERED that:

1. Defendant's motion for judgment on the pleadings (filing 7) is granted, and Plaintiff's second, third, and fourth claims for relief are dismissed.

2. Plaintiff is granted leave to file an amended complaint within 20 days from today's date that will correct the pleading defects noted above in the court's memorandum.

3. Plaintiff shall show cause within 20 days from today's date why its first claim for relief ("filed rate doctrine") should not be dismissed for lack of jurisdiction. Defendant may respond within 10 days after service of Plaintiff's showing, and Plaintiff shall have 5 days thereafter to reply.

DATED: June 20, 2005.          BY THE COURT:

                               s/ Richard G. Kopf
                               United States District Judge